UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

RATNA SIRCAR,                                           COMPLAINT
                        Plaintiff,

            - against -                                 Case No: 23 CIV _____

CITY UNIVERSITY OF NEW YORK; and                       JURY TRIAL DEMANDED
VINCENT BOUDREAU;
                        Defendants.
---------------------------------------------------------X

COMES NOW Ratna Sircar ("Sircar"), by her attorneys, The Law Office of Neal

Brickman, P.C., located at 420 Lexington Avenue - Suite 2440, New York, New York 10170, and

as and for her complaint against defendants, City University of New York ("CUNY") and Vincent

Boudreau ('Boudreau," and together with CUNY, the "Defendants" or "defendants"), hereby avers

and states as follows:

<u>Statement Pursuant to Local Civil Rule 1.9</u>

1.      Plaintiff is an individual citizen of the United States of America and, as such, has

no interests or subsidiaries that need to be disclosed.

<u>Nature of the Action</u>

2.      This action arises under Title VII of the Civil Rights Act of 1964, as amended; New

York Executive Law §296 et seq. and New York City Administrative Code §8-107 et seq., as well

as various additional state and common law causes of action based on Defendants' improper,

discriminatory, retaliatory and disparate treatment of Dr. Sircar.

3.      This action seeks compensatory and punitive damages, as well as costs and

attorneys' fees, based on the continuing policy of discriminatory and retaliatory actions undertaken

by Defendants in improperly treating Dr. Sircar, denying her tenure, and denying her

1

reappointment to her position of Professor – all perpetrated against her by Defendants and various employees thereof, on the basis of her age, race, and national origin – and in retaliation for acts that she had taken to protect her own civil rights.

## Jurisdiction

4.      Jurisdiction over the federal claims is invoked pursuant to 28 U.S.C. § 1331, in that these claims arise under the laws of the United States; and over the state law claims pursuant to the doctrine of pendent jurisdiction as codified in 28 U.S.C. § 1367.  This action is timely filed within ninety (90) days of the issuance on April 21, 2023 of a valid Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC"), a copy of which is annexed hereto as Exhibit "A".

## Venue

5.      This action is properly laid in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1), because the defendant resides in this judicial district, and (b)(2), because a substantial part of the events and omissions giving rise to the claims occurred in this judicial district.

## Parties

6.      Professor Sircar is a seventy-year-old female citizen of the United States of America of Indian  descent and a resident of the State of New York, and who is not Caucasian. Professor Sircar was a tenure-track full professor at the City College of New York ("CCNY") within the City University of New York ("CUNY") system prior to her improper non-renewal and denial of tenure.

2

7.     CUNY is a state university system operating within the City of New York as created and designated pursuant to, *inter alia*, New York Education Law §6210.  It has a distinct legal existence from the State of New York.  CUNY has its own by-laws and regulations, and it and its employees are governed by the relevant Collective Bargaining Agreement ("CBA") that was in place at the relevant time.

8.     Upon information and belief, Vincent Boudreau ("Boudreau") is an individual citizen of the State of New York, a resident of the State of New York and was the Interim President of CCNY – now the President of CCNY.   President Boudreau qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and New York City Administrative Code  §§ 8-107 and 8-502 because he participated directly in the discriminatory conduct at issue in this case and as an "employer" under § 296 of the Executive Law by virtue of his ability to effect the terms and conditions of Dr. Sircar's employment.  Moreover, Boudreau is an aider and abettor who actually participated in the conduct giving rise to the claims of discrimination herein.

<u>Preliminary Statement - Summary of Claims</u>

11.     Dr. Sircar's claims herein are based on the illegal discrimination -- including, but not limited to, disparate treatment, denial of tenure, and reappointment -- perpetrated against her by Defendants and various employees thereof, on the basis of her age, race, and national origin; all in direct contravention of Title VII, *et al*.

12.     Dr. Sircar is a highly respected, nationally and internationally recognized neurobiologist with particular expertise in adolescent brain development and addiction, including alcoholism.

13.     She has multiple degrees, including a Bachelor of Science, a Master of Science, a Doctorate in Physiology (she was awarded the BK Anand Gold Medal for the Best PhD dissertation in Physiology), as well as significant postdoctoral research training.

14.     She is an active member of the American College of Neuropsychopharmacology, an exclusive society of the top neuropsychopharmacologists in the USA and believed to be the sole faculty member of CCNY within its ranks.

15.     Dr. Sircar has published extensively in well-respected neuroscience journals for almost forty-years.  She has authored/co-authored over 40 peer reviewed publications and book chapters.  She has been an invited speaker at important international and national conferences, as well as given invited talks at numerous colleges and research institutions.

16.     Dr. Sircar has also served as a grant reviewer for NIH study sections, and for the NSF panel.

17.     Dr. Sircar teaches bachelors and masters level courses and is an outstanding teacher as evidenced from her teaching evaluations and letters written by her students.

18.     Dr. Sircar has provided important service both to CCNY, and also CUNY-Graduate Center.

19.     Despite her unparalleled credentials, and clearly more than meeting the stated criteria for the granting of tenure, Dr. Sircar was recently denied tenure and renewal of appointment while two younger, non-Indian, non-Asian female Professors with demonstrably less credentials in terms of overall publications, grant funding, peer reviews, outside reviewers, renown in their respective fields, and research and teaching experience, were granted tenure and reappointed.

4

20.     The denial of Dr. Sircar's tenure and the non-renewal of her teaching contract not only constituted blatant age-discrimination, but clearly flew in the face of all relevant academic criteria and standards.  The reason ultimately proffered by President Boudreau was so abjectly unsupportable as to constitute plain and unequivocal pretext.  Given the past history of bias and disparate treatment against Dr. Sircar at the hands of Defendants, the impropriety of this latest act of grievance must not go uncorrected.

General Background History and Prior Discrimination By Way of Background and Context Only

21.     After receiving her doctorate in 1981, Dr.  Sircar was a NRSA Postdoctoral Research Fellow at the Albert Einstein College of Medicine ("Einstein") where she remained for approximately 3 years between 1982 and 1985. During her postdoctoral training she received several prestigious awards.

22.     Thereafter, over the subsequent 17 years, Dr. Sircar received successive promotions from Research Associate to Assistant Professor, to Associate Professor, and to full Professor at Einstein. She also served as the Program Director for the Developmental Neuroscience Program at Einstein between 1992 and 2004.

23.     From 2004 to 2008, Dr. Sircar was a Senior Research Scientist at Zucker Hillside Hospital, an affiliate of Einstein in Glen Oaks, New York. Between 2009 and 2011, Dr. Sircar held the position of Professor at the Elmezzi Graduate School for Molecular Medicine.

24.     Dr. Sircar also was appointed an Investigator at the Feinstein Institute for Medical Research, a position in which she served from 2009 through 2011.

25.     From 1990 through 2016, Dr. Sircar was continuously funded – without any gaps – as the Principal Investigator for no fewer than eight (8) research grants.

26.     In fact, in 2007, Dr. Sircar successfully obtained a grant from the National Institute on Alcohol Abuse and Alcoholism in the amount of $1,195,920 with a term of 2007-2016. That grant was a NIH RO1 grant, the most highly respected and competitive individual grant type awarded by the National Institutes of Health ("NIH").

27.     Dr. Sircar was recruited by CUNY in 2012 as a highly respected leader in her field. She arrived at CUNY in 2012 with three truckloads of equipment, an ongoing grant of nearly $1.2M, and promises from CUNY for a new lab, start-up funds in the amount of $290K and early tenure.

28.     Moving a grant when leaving an institution is not easy since the institution where the original funding occurred can keep the grant by designating an alternative Principal Investigator – a relatively uncomplicated process.

29.     Dr. Sircar specifically bargained for the right to move this grant with her.

30.     It is even more unusual for an institution to part with any equipment, especially expensive equipment that other investigators, or the institution itself, could use, when a Principal Investigator moves to a new institution.  Again, Dr. Sircar was able to persuade the relevant organization that she should be allowed to bring all her equipment so that her research could continue as seamlessly as possible.

31.     After obtaining Dr. Sircar, and her most recent grant, as well as the myriad relevant equipment, CUNY almost immediately reneged on all of its promises.

32.     In direct contradiction to their explicit representations, CUNY did not rebuild her lab in any reasonable time period, much less immediately as had been specifically represented, nor did it provide the promised, bargain for, and agreed upon start-up funds.

6

33.     In fact, it would not be until three (3) years later, until the end of 2015, that Dr. Sircar finally was given the lab that she had been promised.  During the interim, her equipment that she had been able to bring with her was dispersed throughout many rooms and buildings by CUNY.

34.     Moreover, except for the -80 degrees freezer, Dr. Sircar was specifically told not to plug any of the equipment that she had successfully brought with her to CUNY into electrical outlets.  This despite the fact that  sensitive analytical equipment should not remain unplugged for extended periods of time so as to avoid suffering serious, and often irreparable, damage.

35.     The damage to her equipment from lying around unplugged and unused was never corrected by CUNY.

36.     Ultimately, even more detrimental to Dr. Sircar, the lack of a proper lab, derailed and materially hindered her existing grant research and, ironically given Defendants' recent "explanations" materially impeded her ability to obtain future grants and build on her then burgeoning research.

37.     In contrast to this fraudulent, mean-spirited, and improper treatment of Dr. Sircar, CUNY happily rebuilt the lab within months for a Caucasian Male in the Psychology Department hired at the same time that Dr. Sircar was hired.  While this abject disparate treatment was indubitably actionable, Dr. Sircar decided to attempt to work within CUNY's system at that time.

38.     During this same period, Dr. Sircar was also denied early tenure, in direct contradiction of the promises and explicit representations made to her when she decided to move to CUNY.[1]

39.     This three-year delay precluded Dr. Sircar from completing studies proposed in her NIH-funded research during the heart of her grant period and thus prevented her from preparing and submitting a renewal grant application.

40.     CUNY indisputably caused irreparable harm to Dr. Sircar's grant and her career with their disparate treatment in failing to timely complete her lab, refusing to give her the verbally promised start-up funds, and denying her early tenure.

41.     Since that time, in an abject demonstration of its malevolence, discrimination, and shocking bad faith, CUNY has repeatedly attempted to use Dr. Sircar's purported failure to obtain new grants as the Principal Investigator, to justify adverse employment actions undertaken against her when it was its own bad acts that precluded her successful completion of all research proposed in the funded grant and sabotaged any potential follow-up or renewal grant applications.[2]

---

[1] More recently, as an example of age discrimination and disparate treatment at Respondents, Dr. Lesia Ruglass, a significantly younger member of the profession (over ten years younger at that time than  Dr. Sircar had been when she was denied early tenure), came to CCNY in 2020 with a training grant (less money and less prestige than the NIH RO1 grant of Dr. Sircar) on which Dr. Ruglass was only a co-Principal Investigator with her then mentor) but was nonetheless granted early tenure.

[2] As a senior investigator with a continuous history of NIH-funding (R21 and R01 grants), Dr. Sircar is ineligible for applying to most institutional seed money/entry level/early career grants. Her research did not fall under the purview of National Science Foundation (NSF) for funding since her research is related to health - mental illnesses (drug/alcohol addiction and psychosis); NSF does not support clinically oriented grant applications.  Therefore, she can only apply for R series NIH grants which are highly competitive – a circumstance only made more difficult due to Respondents' past history and failure to provide facilities in which Dr. Sircar could complete her funded and future research.

42.     Not surprisingly, the failure to provide the promised laboratory, also had a direct negative impact on Dr. Sircar's publications during that period.  As such, CUNY's own bad acts again were the direct cause of the – albeit baseless, improper, and inaccurate – sole other purported shortcoming with Dr. Sircar's candidacy for tenure, inadequate publications.[3]

Additional Facts Directly Pertinent To The Actionable Discrimination Complained Of Herein

43.     Despite the Respondents initial bad acts and improper disparate treatment of Dr. Sircar, she remained the consummate professional.

44.     Despite being significantly sidelined for over three years, Dr. Sircar's accomplishments at CCNY in terms of teaching and scholarship, as well as service to the college and the public have been numerous, diverse, and exceptional.

45.     Highlights include, but are not limited to and in addition to the accomplishments referenced above, the following:

a.     Every year (except during the pandemic) since joining City College, Dr. Sircar has been invited to give lectures at prestigious scientific meetings and institutions both in the US and abroad. Since joining City College, she has given invited talks/lectures at several international forums in Sydney, Australia (2015), Taipei, Taiwan (2017), prestigious institutions in India (Indian Institute of Science, Bengaluru (2014); Indian Institute of Technology (IIT), Delhi (2016); All-India institute of Medical Sciences (AIIMS), Delhi (2018)), Dubrovnik, Croatia (2017); Casablanca, Morocco (2019), and at six national forums.  In addition, on March 30, 2022, she was invited to give a PRIME Time talk at the Montefiore Hospital/Einstein College of Medicine, Bronx, NY, to

---

[3] Even President Boudreau conceded that Dr. Sircar's "Teaching Effectiveness" and "Service to the Institution" were more than sufficient to qualify for tenure.

neuroscientists, psychiatrists, and neurologists. Invitations to give such talks are extended to individuals with exceptional scholarship and scientific reputation as adjudged by their peers. Such judgments are made without the inherent biases of institutions and based on merits and distinguished qualifications.

b.      Since joining City College, Dr. Sircar has made ten research presentations at meetings organized by major scientific societies (in alphabetical order):

> American College of Neuropsychopharmacology (ACNP);
>
> College on Problems of Drug Dependence (CPDD);
>
> Research Society on Alcoholism (RSoA); and
>
> Society for Neuroscience (SFN).

c.      Dr. Sircar has recently been invited to contribute a manuscript for the first issue of a brand-new international journal on addiction research that will be coming out soon. This again speaks highly of her reputation in the field of drug addiction.

d.      During her time at CCNY, Dr. Sircar has been an Associate Editor for the journal Advances in Drug and Alcohol Research, and a past editorial board member for the Journal of Drug and Alcohol Research. She is routinely asked to review manuscripts for several scientific journals.

e.      Dr. Sircar was also the Co-Principal Investigator on a New York State-funded grant from 2016-2021, prior to which (and prior to Respondents' interference), she was continuously funded for 23 years by NIH with their prestigious and highly competitive R21 and RO1 grants.

f.      She continued to publish, including 6 papers in well-known neuroscience journals. In contrast to many of her peers, Dr. Sircar does not accept second, third, fourth, fifth or beyond authorship on multi-authored papers to boost her publication list; she is the first, last (senior), or

the only author on her publications. Relying on her unique breadth of experience, expertise and knowledge to utilize a hands-on multi-disciplinary approach that consists of biochemical, molecular, genetic, anatomical, and behavioral techniques, Dr. Sircar's papers each present novel and meaningful findings. In 2021, she co-authored a published paper in the journal, Meta Gene, identifying two novel genes that had never before been associated with the mental illness schizophrenia, and has opened up a whole new area for research into the understanding of the neurobiology of the dysregulated genes in the etiology of psychotic disorders, in her lab. These studies were funded by the National Alliance for Research on Schizophrenia and Depression ("NARSAD" which now operates as the Brain and Behavior Research Foundation).  Dr. Sircar is a nationally and internationally recognized neuroscientist whose Scopus score based on productivity and impact of her publications places her in the top 90th percentile for full professor, as determined by the Chair of Psychology.

g.      It is undisputed that Dr. Sircar receives high ratings for her teaching – both at the graduate and undergraduate level, as well as serving as an acclaimed mentor in her lab to students interested in conducting advanced research.

h.      Dr. Sircar has been a member of several committees at the City University of New York Graduate Center (CUNY-GC), including the BCN Executive Committee, the Doctoral Students Admission Committee, the First Exam Committee, and at the City College of New York (CCNY) on the search committee for the selection of the Director of Academic Programs and Undergraduate Studies for the Department of Psychology as well as sitting as a member on numerous masters and doctoral theses committees. She has also served as a member of the CCNY

College Research Council (CRC) for three years during which time the Council worked on a 5-year research plan/vision for the college.

46.     After being unanimously approved for tenure and reappointment by the Colin Powell School P&B Committee in October of 2021, the College-Wide Review Committee then voted to deny her tenure and reappointment on or about November 8, 2021, this despite her evident credentials from a dozen external experts in neuroscience (six selected by Dr. Sircar and six independently selected by the Psychology Department) universally recommending tenure.

47.     Dr. Sircar was 69 years of age (DOB Aug 15, 1952) at the time of that vote.

48.     At the same time the College-Wide Review Committee voted to grant tenure to two younger (by decades), relatively less-qualified candidates who had neither the breadth of experience, publications, grant funding, research, accolades, or multidisciplinary abilities as Dr. Sircar.

49.     Notably, one of the candidates had relatively fewer strong/adequate outside letters of recommendation (the Dean sent back her file to the Chair of Psychology requesting more letters before the P&B Committee would review her application), but her application, contrary to prescribed procedure, was partially supplemented after the fact – albeit still with low number of letters -- but was granted tenure and reappointment.

50.     One of the candidates, Adriana Espinosa, who was born in or about 1981, the same year that Dr. Sircar obtained her Doctorate, joined CCNY as an Assistant Professor in 2014. At the time Dr. Espinosa was granted tenure she had been a Principal Investigator on only 3 grants, each from CUNY, with total funding of less than $15,000. She had been one of several

investigators on two grants, a co-investigator on one, and listed as a collaborator and lead statistician on another: none of which were the highly competitive and top-tier NIH grants.

51.     The other tenured candidate, Dr. Sarah O'Neill, also born in or about 1981, joined CCNY as an Assistant Professor in 2013.  Dr. O'Neill obtained three awards from CUNY prior to her being granted tenure with total funding of less than $16,000.  Dr. O'Neill was only a Co-investigator, but not a Co-Principal Investigator or Principal Investigator on a grant from NIH between 2014 and 2021.

52.     CUNY clearly brought Dr. Sircar to secure her grant funding, her laboratory, and the prestige of her hire, but then shunted her to the side.

53.     Then, when Dr. Sircar's application for tenure came up, Respondents orchestrated her dismissal – despite her self-evident credentials and universal independent peer approval – while promoting two younger, non-Indian, non-Asian, less experienced, less credentialled candidates.

54.     As a result of this clearly disparate treatment, Dr. Sircar was forced to file an appeal of this improper interim vote by the College- Wide Review Committee to CCNY President Boudreau.

55.     Her appeal of the negative recommendation was sent on or about December 8, 2021.

56.     On or about April 13, 2022, President Boudreau set forth his purported reasons for the denial of tenure and reappointment for Dr. Sircar.

57.     In that writing, President Boudreau acknowledges Dr. Sircar's evident Teaching and Service accomplishments. He, however, improperly denigrated her grant procurement and

publications. In so doing he completely ignored the role that Dr. Sircar played in connection with a NYS-funded grant that she helped put together (Dr. Robert Melara, PI); with the NIH RO1 grant that she brought with her and serviced during her employment with Respondents; the quality and depth of her papers (even while acknowledging the quality of the publications which published them) as well as the increase in rate of publications in the years after Respondents actually provided her with her promised laboratory; her manuscript in preparation; her additional grant applications; the difficulty in procuring grants at the level at which Dr. Sircar operates; the societal import and potential for future research of her publications; the unqualified accolades of independent peers in her field; and her guest speaking, panel and lecturer appearances.

58.    The abjectly pre-textual nature of President Boudreau's "statement of reasons" is only further highlighted when his "bases" are compared to the qualifications of the two other candidates who were granted tenure and reappointment during this same academic year.[4]

59.    Unfortunately, CUNY has a history of discriminatory acts and have demonstrated patterns of disparate treatment against protected classes.

60.    Dr. Sircar is, and at all relevant times was, eminently qualified for tenure.

61.    CUNY has not only discriminated against Dr. Sircar but acted to the direct detriment of itself, its students, and the greater good in precluding Dr. Sircar from continuing to teach and carry out her important research.

62.    CUNY' retaliation continued after the denial of her tenure and renewal, as well as her appeal of the same.  Specifically, even after her improper non-renewal, Dr. Sircar was initially

---

[4] Dr. Sircar's union also grieved this improper determination.  The matter is now before an arbitrator as to potential violations of the relevant CBA.

allowed to teach a single course in an adjunct position for the fall 2022 semester, the course was listed in CUNYFirst and several students had already signed up for it, and to do research in her lab at the behest of several of her students.

63.     However, upon learning that Dr. Sircar intended to move forward to attempt to protect her rights under threat of discrimination by pursing an EEOC Charge, the course was stricken from the available course listings and Dr. Sircar has been precluded from serving even as an adjunct.  In addition, her lab has been shut down and dismantled.  Upon information and belief, Boudreau was aware of, and specifically condoned, the decision to preclude Dr. Sircar from maintaining her lab to the benefit of all and from continuing to share her unique/extensive expertise and knowledge with CUNY students, even as an adjunct professor. Such blatant discrimination and retaliation cannot be condoned.

64.     As a direct result of these discriminatory acts on the part of Respondents, Dr. Sircar has suffered professionally and personally, and continues to suffer injury, mental anguish, and harm.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>
(Age, National Origin, and Race Discrimination Under Title VII Against CUNY)

65.     Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "64" above with the same force and effect as if fully set forth herein at length.

66.     Dr. Sircar filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission.

67.     Dr. Sircar received a Notice of Right to Sue Letter from the EEOC and filed this lawsuit within 90 days of receipt of that Notice.

68.     Dr. Sircar is a 70-year-old female of Indian, and Asian, national origin, a non-Caucasian.

69.     As set forth above, CUNY has repeatedly discriminated against Dr. Sircar on the basis of her age and national origin over the last decade.

70.     As set forth above, most recently, CUNY has discriminated against Dr. Sircar, *inter alia*, by improperly denying Dr. Sircar tenure and reappointment in favor of two younger, demonstrably less-qualified, non-Indian and non-Asian candidates who were both granted tenure and reappointment.

71.     In addition, upon information and belief, full professors over the age of 60 who have been granted tenure at CUNY are statistically under-represented.

72.     CUNY has an institutional bias as to granting tenure to older candidates despite their superior credentials.

73.     As set forth above, no older Caucasian or non-Indian professors were treated in a like improper, biased, or discriminatory manner.

74.     As a direct result of these discriminatory acts, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in an amount to be determined at trial, but in no event less than One Million Five Hundred Thousand Dollars ($1,500,000.00) in compensatory damages; Five Million Dollars ($5,000,000.00) in punitive damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION
(Age, National Origin Discrimination and Race Discrimination Under New York State Statutes
Against CUNY and Boudreau and Under New York City Statutes against Boudreau)

75.     Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "74" above with the same force and effect as if fully set forth herein at length.

76.     Both the New York Executive Law and the New York City Administrative Code prohibit workplace discrimination, adverse employment decisions and disparate treatment on the basis of age, national origin, and race.

77.     Dr. Sircar is a 70-year-old female of Indian, and Asian, national origin, a non-Caucasian.

78.     As set forth above, Boudreau qualifies as employers under the relevant statutes or otherwise was an aider and abettor under New York Executive Law in that he actively participated in, and specifically condoned, the wrongful conduct giving rise to the claims for discrimination and retaliation in this matter.

79.     As set forth above, CUNY has repeatedly discriminated against Dr. Sircar on the basis of her age and national origin over the last decade.

80.     As set forth above, most recently, CUNY and Boudreau have discriminated against Dr. Sircar, *inter alia*, by improperly denying Dr. Sircar tenure and reappointment in favor of two younger, demonstrably less-qualified, non-Indian and non-Asian candidates.

81.     The stated reasons for Boudreau's improper determination were clearly pretextual given the qualifications of the other candidates, especially those from Dr. Sircar's own Department.

82.     In addition, upon information and belief, full professors over the age of 60 who have been granted tenure at CUNY are statistically under-represented.

83.     CUNY has an institutional bias as to granting tenure to older candidates despite their superior credentials.

84.     As set forth above, no Caucasian or non-Indian professors were treated in a like improper, biased, or discriminatory manner.

85.     As a direct result of these discriminatory acts, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in an amount to be determined at trial, but in no event less than One Million Five Hundred Thousand Dollars ($1,500,000.00) in compensatory damages; Five Million Dollars ($5,000,000.00) in punitive damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>
(Retaliation Under Title VII Against CUNY)

86.     Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "85" above with the same force and effect as if fully set forth herein at length.

87.     As set forth above, while still employed, but after being denied reappointment and tenure, Dr. Sircar was offered the opportunity to continue to work in her lab and serve as an adjunct professor.

88.     Her course had been listed in the curriculum guide for the following academic semester and students had already selected her course for their curriculum.

89.     However, once CUNY understood that Dr. Sircar would be contesting their improper acts, including through an EEOC filing, CUNY, with the knowledge and approval of

Boudreau, pulled that course from the catalog and refused to allow Dr. Sircar to teach even as an adjunct.

90.     In addition, Defendants refused not only to allow her to continue to complete her laboratory work, but even to allow the lab to remain intact despite the facts that (1) there was no immediate need to dismantle her lab; (2) that they knew the equipment in her lab was irreplaceable, absent monumental cost and expense; and (3) that they knew by forcing the dismantling of her lab would be a death knell to Dr. Sircar's research and her entire career.

91.     There was no legitimate basis for these adverse actions any of which constitute actionable retaliation.

92.     As a direct result of this improper retaliation, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in an amount to be determined at trial, but in no event less than Five Hundred Thousand Dollars ($500,000.00) in compensatory damages; Five Million Dollars ($5,000,000.00) in punitive damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>
(Retaliation Under New York State Statutes as against CUNY and Boudreau and under the New York City Statutes as against Boudreau)

93.     Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "92" above with the same force and effect as if fully set forth herein at length.

94.     Both the New York Executive Law and the New York City Administrative Code prohibit retaliation in the form of, inter alia, workplace discrimination, adverse employment decisions, and disparate treatment on the basis of complaints of discrimination or due to taking

any actions to protect against discrimination or seeking to protect one's rights to be free of discrimination.

95.     As set forth above, Boudreau qualifies as an employer under the relevant statutes or otherwise was an aider and abettor under New York Executive Law in that he actively participated in the conduct giving rise to the claims for discrimination and retaliation in this matter.

96.     As set forth above, while still employed, but after being denied reappointment and tenure, Dr. Sircar was offered the opportunity to continue to work in her lab and serve as an adjunct professor.

97.     Her course had been listed in the curriculum guide for the following academic semester and students had already selected her course for their curriculum.

98.     However, once CUNY understood that Dr. Sircar would be contesting their improper acts, including through an EEOC filing, CUNY, with the knowledge and approval of Boudreau, pulled that course from the catalog and refused to allow Dr. Sircar to teach even as an adjunct.

99.     In addition, Defendants refused not only to allow her to continue to complete her laboratory work, but even to allow the lab to remain intact despite the facts that (1) there was no immediate need to dismantle her lab; (2) that they knew the equipment in her lab was irreplaceable, absent monumental cost and expense; and (3) that they knew by forcing the dismantling of her lab would be a death knell to Dr. Sircar's research and her entire career.

100.     There was no legitimate basis for these adverse actions any of which constitute actionable retaliation.

101.     As a direct result of this improper retaliation, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in an amount to be determined at trial, but in no event less than Five Hundred Thousand Dollars ($500,000.00) in compensatory damages; Five Million Dollars ($5,000,000.00) in punitive damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

<u>Jury Demand</u>

102.     Plaintiff hereby demands a trial by jury.

WHEREFORE, Dr. Sircar respectfully demands judgment against Defendants on her various causes of action set forth herein, along with any such other relief to her as the Court deems just and proper.

Dated: New York, New York
        July 20, 2023

Ethan Leonard, Esq.
The Law Offices of Neal Brickman, P.C.
Attorneys for Dr. Ratna Sircar
420 Lexington Avenue - Suite 2811
New York, New York 10170
(212) 986-6840
ethan@brickmanlaw.com

21